IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DAVID MACHIN,

    Plaintiff,

    v.                                    CIVIL NO. 03-1446 (RLA)

LEO BURNETT, INC.,

    Defendant.

**ORDER IN THE MATTER OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

    Plaintiff, DAVID MACHIN, instituted these proceedings alleging age discrimination and retaliation pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634. Additionally, plaintiff has asserted age discrimination under the local discrimination statute, Law No. 100 of June 30, 1959, 29 P.R. Laws Ann. § 146 (2002) ("Law 100") and damages under the constitutional policy exception to Puerto Rico's unjust dismissal statute, Law No. 80 of May 30, 1976, 29 P.R. Laws Ann. §§ 185a-185k (2002) ("Law 80").

    The Court has before it defendant's motion for summary judgment which has been duly opposed by plaintiff.

**THE FACTS**

    1. LEO BURNETT PUERTO RICO ("LEO BURNETT-PR") is an advertising agency, organized and doing business in the Commonwealth of Puerto Rico.

CIVIL NO. 03-1446 (RLA)                                    Page 2

---

2. On May 15, 2000 plaintiff DAVID MACHIN was hired for the position of Vice-President, Chief Financial Officer ("CFO") for LEO BURNETT-PR by EDWARD ("KIT") BENAVENT, the agency's Chief Executive Officer.  At the time he was hired plaintiff was forty-eight (48) years old.

3. BENAVENT was hired as President of LEO BURNETT-PR in December 1999.  At the time he was recruited BENAVENT was forty-six (46) years old.

4. Plaintiff was interviewed for the position by JORGE CAVERZASCHI, Regional Finance Director.

5. On May 8, 2000 plaintiff received a letter from BENAVENT confirming his compensation terms as follows: (1) salary one hundred and twenty-five thousand dollars ($125,000.00) with (2) a guaranteed bonus of fifteen thousand dollars ($15,000.00).  The bonus could vary according to specific plans and results.

6. MACHIN's duties as CFO included the development, implementation and monitoring of annual business plans and financial projections. Plaintiff supervised all accounting functions including the review and approval of interim financial statutory reports, cash flows projections and cash disbursements. He was in charge of determining year-end salary adjustment, performance bonus and promotions. Additionally, plaintiff was also one of the persons responsible for negotiating volume bonus agreements with the media and production houses. Other duties included preparing and analyzing

**CIVIL NO. 03-1446 (RLA)**                                         **Page 3**

client's profitability, variance analysis of budgets *versus* actual and other reports considered necessary in order to control expenses.

7. MACHIN's supervisors at LEO BURNETT-PR were BENAVENT and CAVERZASCHI. Plaintiff, as the local finance director or CFO, reported to BENAVENT, the local managing director or CEO. By the same token, local finance directors - in this case MACHIN - reported to the regional finance director, i.e., CAVERZASCHI.

8. MACHIN was terminated from employment at LEO BURNETT on February 27, 2002.

9. Plaintiff's successor, HECTOR CRUZ, was 36 years old at the time he was hired.

<b>SUMMARY JUDGMENT</b>

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine issue exists if there is sufficient evidence supporting the claimed

factual disputes to require a trial.  Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994).  A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F. 3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir.1995)).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment."); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st

CIVIL NO. 03-1446 (RLA)                                          Page 5

Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment.". Cruz-Baez v. Negron-Irizarry, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2000); Grant's Dairy v. Comm'r of Maine Dep't of Agric., 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 412 (1st Cir. 2000); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## ADEA

The ADEA makes it "unlawful for an employer... to discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). Under the ADEA, an employer is liable if age was the motivating factor in the employer's decision. "That is, the plaintiff's age must have 'actually played a role in [the employer's decision making] process and had a determinative influence on the outcome'." Reeves, 530 U.S. at 141; 120 S.Ct. 2097; 147 L.Ed.2d 105 (*citing* Hazen Paper Co. v. Biggins, 507 U.S. 604, 610; 113 S.Ct. 1701; 123 L.Ed.2d 338 (1993). Thus, in this case, plaintiff has the burden of establishing that defendant intentionally discriminated against him based on his age. *See*, Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 12 (1st Cir. 1998).

Where, as here, there is no direct evidence of discrimination, the plaintiff may prove his case through the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Rivera Rodriguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 25 (1st Cir. 2001); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (2000); Feliciano v. El Conquistador, 218 F.3d 1, 5 (1st Cir. 2000). Under this framework, the plaintiff must prove that: (1) he was over forty (40) years of age; (2) his job performance was sufficient to meet his employer's legitimate job expectations; (3) he experienced an adverse employment action; and (4) the employer continued to need the services of the

CIVIL NO. 03-1446 (RLA)                                          **Page 7**

---

position claimant occupied. *See*, <u>De La Vega v. San Juan Star, Inc.</u>, 377 F.3d 111, 117 (1st Cir. 2004); <u>Gonzalez v. El Dia, Inc.</u>, 304 F.3d 63, 68 n.5 (1st Cir. 2002); <u>Udo v. Tomes</u>, 54 F.3d 9, 12 (1st Cir. 1995); <u>Goldman v. First Nat'l Bank of Boston</u>, 985 F.2d 1113, 1117 (1st Cir. 1993).

Once plaintiff has complied with this initial prima facie burden the defendant must "articulate a legitimate nondiscriminatory reason" for the challenged conduct at which time presumption of discrimination fades and the burden then falls back on plaintiff who must then demonstrate that the proffered reason was a "pretext" and that the decision at issue was instead motivated by discriminatory animus. <u>Gu v. Boston Police Dept.</u>, 312 F.3d 6, 11 (1st Cir. 2002); <u>Gonzalez v. El Dia, Inc.</u>, 304 F.3d at 69; <u>Zapata-Matos v. Reckitt & Colman, Inc.</u>, 277 F.3d 40, 44-45 (1st Cir. 2002); <u>Feliciano v. El Conquistador</u>, 218 F.3d at 5; <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d. 46, 54 (1st Cir. 2000). "At this third step in the burden-shifting analysis, the *McDonnell Douglas* framework falls by the wayside because the plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." <u>Feliciano v. El Conquistador</u>, 218 F.3d at 6 (citing <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (internal citations and quotation marks omitted).

CIVIL NO. 03-1446 (RLA)                                         Page 8

The required prima-facie-case showing generates a rebuttable presumption that the defendant-employer violated the ADEA. Whereupon, the burden of production -- as distinguished from the burden  of proof -- shifts to the defendant-employer  to  articulate  a  legitimate, nondiscriminatory basis for its adverse employment action. Once this limited burden has been met by the defendant-employer, the presumption which attended the prima facie case vanishes and the claimant must adduce sufficient creditable evidence that age was a motivating factor in the challenged employment action. The plaintiff-employee may meet her burden of proof by showing that the employer's proffered reason for the challenged employment action was pretextual, from which the factfinder in turn may, but need not, infer the alleged discriminatory animus.

Gonzalez v. El Dia, 304 F.3d at 68-69 (citations omitted).

"Upon the emergence of such an explanation, it falls to the plaintiff to show both that the employer's proffered reasons is a sham, and that discriminatory animus sparked its actions." Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d at 384 (citation and internal quotation marks omitted).

Defendant's "burden is one of production, not persuasion" Reeves, 530 U.S. at 142, 120 S.Ct. 2097, 147 L.Ed.2d 105, and "[a]t all times, the plaintiff bears the 'ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff.'" <u>Gu v. Boston Police Dept.</u>, 312 F.3d at 11 (citing <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207). *See also*, <u>Reeves</u>, 530 U.S. at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105.

The fact that the reasons proffered by the employer are discredited by plaintiff does not automatically mandate a finding of discrimination. "That is because the ultimate question is not whether the explanation was false, but whether discrimination was the *cause* of the [conduct at issue]. We have adhered to a case by case weighing.  Nonetheless, disbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude the employer had discriminated." <u>Zapata-Matos v. Reckitt & Colman, Inc.</u>, 277 F.3d at 45 (citations omitted)(italics added); <u>Reeves</u>, 530 U.S. at 147-48, 120 S.Ct. 2097, 147 L.Ed.2d 105.

In a summary judgment context the court must determine "whether plaintiff has produced sufficient evidence that he was discriminated against due to his [age] to raise a genuine issue of material fact." <u>Zapata-Matos v. Reckitt & Colman, Inc.</u>, 277 F.3d at 45; <u>Rivas Rosado v. Radio Shack, Inc.</u>, 312 F.3d 532, 534 (1st Cir. 2002). Thus, summary judgment will be denied if once the court has reviewed the evidence submitted by the parties in the light most favorable to the plaintiff it finds there is sufficient evidence from which a trier of fact could conclude that the reasons adduced for the charged conduct are

CIVIL NO. 03-1446 (RLA)                                        **Page 10**

pretextual and that the true motive was discriminatory. <u>Santiago-Ramos v. Centennial</u>, 217 F.3d at 57; <u>Rodriguez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d 15. 20 (1st Cir. 1999).

### (a) Plaintiff's Prima Facie Case

Plaintiff's age discrimination claim rests on what he labels "a hostile and discriminatory animus against older employees" evidenced by a list of employees over 40 years old LEO BURNETT wished to discharge. Once these employees left or were terminated they were replaced by younger persons.[1] According to plaintiff the last person on the list to leave was CATHY LUCAS who resigned after being "demoted and removed from her office."[2]

Plaintiff claims that:

> There is clear and direct evidence of an intentional pattern and practice of discrimination because of age. Plaintiff was a pawn in defendant's game. He was hired to replace an older woman. At the time of plaintiff's hiring defendant considered him younger.

Plaintiff's Opposition (docket No. 88) p.2.

Lastly, plaintiff rejects defendant's reasons for discharge as "pretextual" and submits that he was never evaluated nor subjected to disciplinary measures but rather received a performance bonus, his

---

[1]  Plaintiff's Opposition (docket No. 88) p.2.

[2]  *Id.*

birthday was celebrated at work and the human resources consultant indicated that the employee relations in his division had improved.

For purpose of today's ruling we will assume that plaintiff met his prima facie burden under the *McDonnell Douglas* burden allocation process.

### (b) Non-Discriminatory Reasons for Dismissal and Pretext

In order to rebut the presumption triggered under the *McDonnell Douglas* framework both BENAVENT and CAVERZASCHI stated under oath that the decision to terminate MACHIN was prompted by several reasons including: (1) the loss of reliability in the financial information sent by plaintiff, (2) a budget presentation at LEO BURNETT in late 2001 where plaintiff was asked direct questions and he was not able to provide answers and (3) MACHIN's problems with other employees.

According to CAVERZASCHI the decision to dismiss plaintiff was not taken on a particular date but was part of a process. He indicated that "[w]e were not happy with the performance, and the performance was not improving, and we decided to terminate his employment."[3]  He summarized the reasons as follows:

"[I]t was a lack of reliability in the financial information. We had problems in fee negotiations with clients. We had a discussion of the annual business plan... [in October or November 2001] in Miami, where Mr. Machin was asked many questions, and he didn't know the answers.

---

[3]  CAVERZASCHI's deposition p.39.

So it was a process of lack of reliability of the financial information that he was generating.

CAVERZASCHI's deposition p.41.

MR. CAVERZASCHI indicated that he had been requested by Leo Burnett Headquarters to participate in the PHILLIP MORRIS fee negotiations "due to the lack of reliability in the information generated by Leo Burnett Puerto Rico."[4] He also mentioned there were "problems with the timing, and the level analysis of the report. So, explanation of variances didn't make sense... [a]nd that reports were not consistent."[5]

This information was also confirmed by MR. BENAVENT in his deposition.

Mr. Caverzaschi was asked to come down and be part of the Phillip Morris meeting because both Phillip Morris and Chicago had been submitted information on several occasions which was, which was (sic) not consistent, and therefore creating credibility problems. And he was asked to come down personally to address the issue.

Q. Okay. So this inconsistency issue dealt with Phillip Morris account.

A. No. He came, for that visit, for Phillip Morris. But he, he had inconsistencies with reportings, with

---

[4]  CAVERZASCHI's deposition p.44.

[5]  *Id.*

CIVIL NO. 03-1446 (RLA)                                          **Page 13**

overhead calculations, on the general finances of the company.

BENANVENT's deposition p.76.

During a PHILLIP MORRIS presentation held in June 2001 CAVERZASCHI became aware that some costs of persons generating art department revenue had been also included in the fee charged to the client, that is, that certain jobs had been budgeted twice. Whereupon CAVERZASCHI notified MACHIN that this approach was unacceptable and gave him instructions for it to be discontinued. CAVERZASCHI indicated that he learned of this situation "in the middle of the presentation, from information generated by Leo Burnett Puerto Rico finance department. I was very disappointed."[6]

Additionally, there is an e-mail exchange between plaintiff and JORGE CAVERZASCHI from September 5 to September 7, 2001 which confirms CAVERZASCHI's concern regarding the numbers provided by plaintiff for the PHILLIP MORRIS account.

Plaintiff acknowledges inconsistencies regarding the PHILLIP MORRIS account but claims it was due to the agency's practice of not reporting to the client the real expenses and revenues.

MR. CAVERZASCHI indicated that plaintiff could not respond to inquiries regarding LEO BURNETT's budget at the Miami annual business plan meeting and that during the meeting plaintiff left the room to make a telephone call to verify certain information.

---

[6] CAVERZASCHI's deposition p. 35.

CIVIL NO. 03-1446 (RLA)                                        **Page 14**

In his deposition BENAVENT testified that "there were some questions [plaintiff] was not able to answer" but he could "not remember the [precise] questions" and that plaintiff "exited the room to make a phone call to Puerto Rico to try and answer the questions."[7]

Plaintiff, on the other hand, claims that he answered all questions posed at the time and argues that he called his assistant in Puerto Rico merely to confirm his response regarding a specific column pertaining to Art Department Revenue.

Plaintiff argues that the reasons advanced by defendant for his discharge are pretextual. He claims that there was nothing wrong with his performance nor was he evaluated or subjected to disciplinary measures while at LEO BURNETT. Rather, he received two commendation letters from BENAVENT and a performance bonus.

There are two memoranda from BENAVENT congratulating plaintiff on his role at a planning meeting and later on during the CAVERZASCHI and GIACOMO ZANDOMENEGO's[8] visit dated April 1 and 21, 2001.

On the other hand, there is a memorandum dated October 31, 2001 from BENAVENT reprehending plaintiff over his attitude at a meeting the previous day which MR. BENAVENT characterized as "unconstructive tone and demeanor" in the presence of another employee.

---

[7]  CAVERZASCHI's deposition p.70.

[8]  MR. ZANDOMENEGO was LEO BURNETT's Group President Latin America.

CIVIL NO. 03-1446 (RLA)                                          **Page 15**

Additionally, plaintiff argues that he was able to update bank reconciliations, fixed asset schedules, account receivables and collection efforts as well as implemented cost-reduction measures which have not been disputed by defendant. CAVERZASCHI acknowledged that plaintiff reduced the amount of the outstanding receivables and that the financial condition of the company improved from 1999 to 2002.

Plaintiff indicated that in 2001 he was able to negotiate volume bonifications[9] with the media up to $1.4 million dollars from $188,000.00 the previous year and that because volume bonifications surpassed the one million dollar mark[10] he received a $25,000.00 performance bonus.[11]

It is uncontested that the agency's financial situation dramatically improved during plaintiff's tenure. The year previous to plaintiff's hiring, the company had lost $1.4 million dollars and had accrued losses of nearly $4 million. The first year it had a profit of over $100,000.00 and the second year nearly $1 million.  When plaintiff started at the agency there were 28 employees and when he

---

[9]    Volume bonifications are a percentage of the total business secured from the agencies which the various media grant the advertising agencies.

[10]    Plaintiff was paid $10,000.00 in December 2001 and the remaining $15,000.00 in January 2002.

[11]    Plaintiff was offered a 2.5% of a million, i.e., $25,000.00 by KIT BENAVENT if he was able to negotiate volume bonifications with the media surpassing one million dollars.

left there were 50; invoicing was at $11 million and increased to nearly $30 million; LEO BURNETT was ranked Number 21 or 26 and advanced to the first ten.

In support of his argument that the alleged interpersonal conflicts are also pretextual plaintiff points to the fact that his birthday was celebrated at work and the human resources consultant indicated that the employee relations in his Division had improved.

On the other hand, it is undisputed that at the time of plaintiff's discharge defendant had before it not only a report prepared by MARITZA RIVERA, a consultant, which contained alleged complaints of personnel working in plaintiff's division but also two claims filed by LEO BURNETT employees charging plaintiff with discrimination and harassment.

In August 2001 MARITZA RIVERA was hired by LEO BURNETT-PR as an independent Human Resources consultant. As part of the scope of the services she provided, MS. RIVERA interviewed the agency's employees to assess the work atmosphere and prepared a report.[12] According to MS. RIVERA, the Accounting Department was the one that concerned her the most due to her findings after having met with the employees of that department on February 1, 2002. The same was provided to BENAVENT. According to the document, employees complained of excessive pressure from MACHIN as well as his constant threats and

---

[12]   Defendant's Statement of Material Facts (docket No. 77) Exh. 12.

CIVIL NO. 03-1446 (RLA)                                          **Page 17**

tone. He would show them the classified ads and ask whether that is where they wished to be. They indicated that ever since MACHIN arrived the work atmosphere has been very tense and unpleasant. He would humiliate them and underestimate their work. They also requested evaluations of their work. The females felt uncomfortable with the way plaintiff looked at them and "undressed" them with his eyes. They stated that they were forced to cover themselves with blazers.

On the other hand, MS. RIVERA noted that by February 15, 2002 the working relations in plaintiff's division had improved.

Plaintiff objects to the admissibility of RIVERA's report as hearsay evidence. However, where the employer points to an investigation as grounds for its decision the question is not which version of the facts was true, but "whether... [the investigator] and [plaintiff's] superiors believed what he had been told by those he interviewed." Ronda-Perez v. Banco Bilbao Vizcaya, 404 F.3d 42, 45 (1st Cir. 2005). *See also*, Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996) (issue not whether the reasons proffered were real but whether the employer believed them to be so.)

Plaintiff challenged the validity of the report arguing that he was never interviewed nor did MS. RIVERA appraise him of her findings. Additionally, plaintiff submitted the deposition testimony

of various LEO BURNETT employees[13] who testified that they had a good working relationship with plaintiff in an attempt to undermine the report's accuracy.

Defendant, on the other hand, submitted declarations of three Finance Department employees[14] confirming the meeting and vouching for the poor interpersonal relationships the personnel had with MR. MACHIN.[15]

In support of its argument that plaintiff's termination was also due to problems with co-workers defendant submitted two complaints filed against MACHIN.

On June 8, 2001 CARMALY VALCARCEL submitted a formal grievance to the Agency complaining of sexual harassment by MACHIN.[16] According to MS. VALCARCEL while working as a receptionist, she was subjected to recurrent unwanted comments, insinuations and sexual advances by plaintiff.

---

[13]   (1) JOSE BRUNET - VicePresident Client Service, (2) WANDA REICHARD - Director Client Service, (3) ZARITZA GOTAY - Administrative Assistant to BENAVENT, (4) CATHY LUCAS - Creative Department, and (5) XIOMARA DICKINSON - Executive Secretary for EDWARD BENAVENT. None of these individuals worked in the Finance Department.

[14]   (1) CARLOS CANCEL GUZMAN, (2) SHEILA MARIE VELAZQUEZ SEGUI and (3) ROSA MARIA DEL VALLE.

[15]   Plaintiff objects to these testimonies as not previously announced. We find that under the procedural scenario before us they present rebuttal testimony and are thereby admissible.

[16]   On October 22, 2002 MS. VALCARCEL filed a complaint against both LEO BURNETT and MACHIN based on these facts.

CIVIL NO. 03-1446 (RLA)                                      Page 19

On August 22, 2001 EUGENIO AMADOR filed a complaint against both LEO BURNETT-PR and MACHIN claiming that he had been subjected to racial harassment and age discrimination by plaintiff since he was appointed Finance Director. AMADOR further alleged abusive behavior on plaintiff's part on a daily basis which forced him to leave his employment.

Plaintiff discards these two actions as inconsequential alleging that they were eventually voluntarily dismissed by the plaintiffs.

Defendant further seeks to undermine plaintiff's age discrimination claim based on an affidavit signed by MACHIN on February 26, 2002 regarding an outstanding suit at the time filed by CATHY LUCAS wherein plaintiff attested that during his tenure with LEO BURNETT he had never heard discriminatory comments from KIT BENAVENT. On October 9, 2003, after having initiated this action, plaintiff signed another affidavit retracting from his previous position explaining that he had been induced into error and had signed the document under the influence of Tylenol cold medication.

"It is settled that '[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.'" Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000) (citing Colantuoni v. Alfred Calcagni

CIVIL NO. 03-1446 (RLA)                                         **Page 20**

& Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)); Sailor Inc. F/V v. City of Rockland, 324 F.Supp.2d 197, 202 (D.Me. 2004).

The timing of the recanting, i.e., in response to a summary judgment request has been held crucial as well as whether or not a satisfactory explanation for the change in testimony has been provided. Colantuoni, 44 F.3d at 5. *See i.e.,* Torres, 219 F.3d at 20-21 ("post-summary judgment affidavit... does not indicate that there was any confusion at the time of his deposition testimony... nor does it allege that the prior testimony was in error.").

In this particular case plaintiff has adduced various reasons for rejecting his previous testimony ranging from not having prepared or read the original document previous to his signature and the fact that he was under the influence of cold medication at the time. Additionally, the second declaration was prepared close to a year prior to defendant's summary judgment request.

Therefore, we will not strike plaintiff's second declaration as defendant suggests but rather it will be given due weight by the fact-finder at trial.

Similarly, defendant points to a July 23, 2002 letter sent by plaintiff to LEO BURNETT worldwide's President challenging his termination purportedly due to his opposition to the agency's improper, unethical and/or illegal business practices. However, no mention of any age discrimination conduct appears in the

CIVIL NO. 03-1446 (RLA)                                           **Page 21**

correspondence. Again, the weight to be accorded to this evidence by the trier of fact will be decided at trial.

We find that plaintiff has presented sufficient evidence to put at issue the accuracy of defendant's proffered reasons for his discharge. There is a factual controversy over plaintiff's performance at the meeting in question while at the same time plaintiff's version of the improvement in the accounting practices in his division has gone unchallenged. Additionally, there is no documentation evidencing defendant's dissatisfaction with plaintiff's performance, no evaluations, memoranda, or any other written indication that plaintiff was not performing up to par. Further, the nature of plaintiff's relationship with co-workers has also been the subject of differing versions.

### (c) Evidence of Age Discrimination

Discrediting defendant's proffered reasons does not automatically entail a finding of age discrimination. Thus, plaintiff's showing of pretext in this case does not necessarily defeat defendant's summary judgment motion. There must be sufficient evidence in the record for a reasonable factfinder to infer that plaintiff's termination was due to his age. "The question to be resolved is whether the defendant's explanation of its conduct, together with any other evidence, could reasonably be seen by a jury not only to be false but to suggest an age-driven animus." Ronda-Perez v. Banco Bilbao Vizcaya, 404 F.3d at 44.

CIVIL NO. 03-1446 (RLA)                                              **Page 22**

According to CAVERZASCHI, LEO BURNETT-PR's financial condition in 1999 was very poor, there were heavy losses which prompted the decision to change the directors of managing and finance.

TOM LANKTREE was employed approximately a year and a half at LEO BURNETT-PR initially as Strategic Planning and Group Account Director and in 1999 designated to replace EFREN PAGAN, the former Managing Director. In his deposition MR. LANKTREE indicated that he received instructions from his supervisors in Florida to prepare a list of some of the senior employees at LEO BURNETT-PR and calculate the financial impact of their termination as a consideration for a cost reduction mechanism due to the poor financial situation. The list was prepared in September 1999. "Most of those people were senior people with high salaries."[17]  "High salaries relative to the operation and they had been in the operation a while."[18] "I do recall that the financial impact was quite elevated. I think it may have been to the tune of about a half a million dollars".[19]  These employees were over 40 years of age.

According to LANKTREE, CATHY LUCAS from the Creative Department was on the list.[20] LUCY GARCIA, the former Financial Director did not

---

[17]  LANKTREE's deposition p. 19.

[18]  *Id.*

[19]  *Id.* at 21.

[20]  LANKTREE identified the following individuals as included in the list: CECILIA CARVAJAL, CATHY LUCAS, MARGARITA and CHIQUI.

**CIVIL NO. 03-1446 (RLA)** **Page 23**

appear on the list but was also marked for termination and eventually replaced by plaintiff. She was over 50 years of age at the time of her termination.    MR. LANKTREE was dismissed in December 1999 and replaced by MR. BENAVENT.

CATHY LUCAS testified that when BENAVENT took over there was "a definite bias towards older people."[21] "[T]he older people started leaving for different reasons. They were out, one by one"[22] and that he would refer to older employees and clients in derogatory terms.

Plaintiff described BENAVENT's discriminatory behavior regarding older employees, particularly CATHY LUCAS[23] and references to them as "the old ones", "midwives" and "witches".[24] According to plaintiff, BENAVENT indicated that he wanted to get rid of CATHY LUCAS as soon as possible "as well as all of the old employees or the old guard and that he wanted to hire young people, pretty, specially women."[25]

XIOMARA DICKINSON, testified that she worked as Executive Secretary for EDWARD BENAVENT for approximately eight to nine months commencing in August 2000. According to the deponent she resigned early February 2001 due to the "stressful" and "hostile" environment. MS. DICKINSON complained of the use of "curse words" as well as

[21] CATHY LUCAS' deposition p. 19.

[22] *Id.*

[23] Plaintiff's deposition p. 93.

[24] *Id.* 82.

[25] *Id.* p. 93.

"people... plotting against each other to get people out of the way."[26] Specifically, "talking about the employees that had been there for many years, twenty (20), fifteen (15) years and referring to them as they were incapable, that they were old people, that he was sick of them, that he wanted to bring in new people, fresh blood".[27] MS. DICKINSON further testified "[t]his happened very frequently" with regards to MILDRED GARCIA and CATHY LUCAS.[28] She further noted that "I would say the group of people who had been there for a very long time. I didn't see how they were part of the company anymore, really. They were there to do their job but they weren't – I felt like they weren't important."[29] The deponent further indicated that BENAVENT had a discriminatory animus against the older employees.[30] She also described the negative attitude and specific incidents regarding MILDRED GARCIA and CATHY LUCAS.

MS. DICKINSON testified in her deposition that plaintiff "was treated differently" by BENAVENT than a group of younger employees who were treated "in a friendly manner"[31] and with whom he had an

---

[26] DICKINSON's deposition pp. 18-19.

[27] *Id.* p. 21.

[28] *Id.*

[29] *Id.* p. 22.

[30] *Id.* p. 42.

[31] *Id.* p. 41.

CIVIL NO. 03-1446 (RLA)                                          Page 25

"open door policy."[32] However, she could not attribute BENAVENT's behavior to age bias. She stated that "there were never comments about his age."[33] Basically she described the relationship as MR. BENAVENT being "really cold" which made it "difficult for MR. MACHIN to approach him... it seemed like [BENAVENT] didn't really get along with [plaintiff]... I did witness Mr. Machin making an effort to have like a good working relationship with him and I witnessed – I would witness that – I could see that Mr. Benavent was really cold. So it was like – it's (sic) difficult for Mr. Machin to approach him."[34]

All testimonies regarding age submitted by plaintiff consistently point to the old guard, i.e., long-time employees as the subject of the discriminatory remarks and treatment. None of the numerous age-related comments cited by plaintiff in his memoranda were addressed to him. Rather, the undisputed evidence on record indicates that eliminating the senior employees who received the higher salaries was part of a concerted plan designed since 1999 to address the economic situation of the local advertising concern.

While it is true that MS. DICKINSON indicated that plaintiff and BENAVENT did not have a good working relationship she could not attest that it was motivated by plaintiff's age. This contrasts with her testimony that she specifically noted BENAVENT's clear intentions

---

[32] *Id.* pp. 40-41

[33] *Id.* p. 34.

[34] *Id.* p. 35

CIVIL NO. 03-1446 (RLA)                                        **Page 26**

to get rid of the long-term employees as well as ageist remarks regarding MILDRED GARCIA and CATHY LUCAS.

In sum, despite the abundant age-related comments submitted by plaintiff there is not a single reference to plaintiff's age at any time by any witness or in any document. Rather, these age biased remarks and negative behavior are connected to pre-BENAVENT era employees. While we do not condone this behavior plaintiff cannot capitalize on discrimination directed at a distinct category of employees targeted for reasons not applicable to him.

The only evidence submitted regarding plaintiff's age was a casual conversation with CAVERZASCHI during his first visit to Puerto Rico - which took place shortly after plaintiff was hired[35] and which plaintiff described as follows:

> A. In one of the visits that he came here after I was hired. I believe I was going to lunch or I believe he asked me to take him to his hotel. And casually speaking that he had been at an auditing firm, I told him "Me too," that I came from an auditing firm. And he asked me, "How old are you?" And I said, at that time, well, forty-nine or something like that, forty-eight(48), forty-nine (49). And he said, "You're forty-nine (49) years old? You don't look

_____

[35] In his deposition CAVERZASCHI indicated that he visited Puerto Rico shortly after plaintiff took over in May 2000. Deposition p. 17.

CIVIL NO. 03-1446 (RLA)                                          Page 27

_____

that old." And I asked him "How old are you?" And I believe

he said thirty-five (35) or thirty-six (36). I don't know.

          And from then it was nothing. I mean, it was casual.

It was nothing inquisitive or anything. It was just a

regular conversation driving in a car. I mean, nothing. The

only thing that surprised him was that I was almost fifty

(50) years old.

                              . . . .

          Q. Do you remember the date?

          A. It must have been the first visit he came to Puerto

Rico after I was hired.

Plaintiff's deposition p. 99.

          Plaintiff argues that this conversation "raises an inference

that plaintiff was hired out of a mistake. Particularly, defendant's

impression that plaintiff was much younger, because he, as a matter

of fact looks younger."[36] At the time he was hired plaintiff was 48

and KIT BENAVENT 46.

          Apart from the fact that we fail to see the logic in plaintiff's

argument, we find that this innocuous remark which plaintiff readily

admits was made in a casual conversation over a year before he was

terminated cannot be considered as an inference much less evidence of

age bias. *See* <u>Gonzalez v. El Dia, Inc.</u>, 304 F.3d at 70 (remarks

_____

          [36] Plaintiff's Opposition (docket No. 88) p. 17.

susceptible to non-discriminatory interpretations not evidence of age-based animus).

Under the particular circumstances of this case it defies logic that the same persons who interviewed and recruited plaintiff as CFO suddenly found him "old" for the position merely because they happened to learn his chronological age as plaintiff contends. When a plaintiff is both hired and fired by the same individuals there is a strong inference that the termination was not motivated by age particularly when these two events occur within a relative short period of time. Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 512 (1st Cir. 1996); Le Blanc v. Great Am. Inc. Co., 6 F.3d 836 (1st Cir. 1993).

It is important to note that the court's role is not to judge whether personnel decisions are correct or wise.  Our role is limited to determining whether indeed plaintiff's termination was prompted by his age. "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere." Gonzalez v. El Dia, Inc., 304 F.3d at 69 (internal brackets and quotation marks omitted). *See also*, Loyal v. Hasbro, Inc., 380 F.3d 14, 19 (1st Cir. 2004) (relevant inquiry whether reason given by the employer is the real reason for its action and whether decision was based on plaintiff's age instead).

### (d) Conclusion

Based on the overall record construed in the light most favorable to plaintiff we find that there is not sufficient evidence of age bias for a reasonable trier of fact to conclude that plaintiff's termination was due to his age. Accordingly, defendant's motion is **GRANTED** and plaintiff's claim for age discrimination under ADEA is **DISMISSED**.

### ADEA - RETALIATION

In his opposition to the summary judgment request plaintiff makes reference to a retaliation cause of action in that "he opposed and objected defendant's practices to discriminate against older employees".[37] Similarly, in the complaint plaintiff alleges that he "observed discriminatory treatment against several older employees"[38]; MR. BENAVENT "made derogatory comments and age comments against Ms. Cathy Lucas and Mildred Garcia"[39]; MR. BENAVENT "became very upset by plaintiff's defense of these employees" who were subjected to what plaintiff considered to be "unfair and illegal" actions which placed the Company at risk and which plaintiff could not condone[40]; "Mr. Benavent felt that Ms. Lucas was too old for the position, he told plaintiff he wanted a younger person, preferably a male, for the

---

[37]  Plaintiff's Opposition (docket No. 88) p. 19.

[38]  Complaint ¶ 26.

[39]  Complaint ¶ 27.

[40]  Complaint ¶ 29.

CIVIL NO. 03-1446 (RLA)                                              Page 30

job"[41]; against plaintiff's recommendation Mr. Benavent demoted MS. LUCAS[42] and moved her out of her office and denied her bonus.[43] Plaintiff further alleges that "[d]ue to plaintiff's opposition to defendant's discriminatory and hostile work environment against Ms. Lucas, and others Mr. Benavent also began to create a hostile work environment against plaintiff... in reprisal for opposing discrimination"[44] which eventually culminated in his termination from employment.[45]

The ADEA specifically proscribes retaliation at 29 U.S.C. § 623(d) which reads: "It shall be unlawful for an employer to discriminate against any of his employees... because such individual... has opposed a practice made unlawful by this section, or because such individual... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." Hence, the statute has two variants commonly referred to as the "opposition" clause and the "participation" clause.

The "participation" clause protects those who have in any way partaken in ADEA-related proceedings whereas the "opposition" clause

---

[41]   Complaint ¶ 30.

[42]   Complaint ¶ 31.

[43]   Complaint ¶ 32.

[44]   Complaint ¶ 32.

[45]   Complaint ¶¶ 33, 34 and 35.

CIVIL NO. 03-1446 (RLA)                                        **Page 31**

safeguards individuals who have made their opposition to illegal discriminatory practices known.

In order to prevail in a retaliation claim an individual must either oppose age-based practices or participate in ADEA-related proceedings. Thus, in order to trigger statutory coverage plaintiff must specifically base his dissatisfaction or actions on ageist grounds. "Only activity done to oppose age discrimination is protected conduct under the ADEA." Ambers v. Village Serv. Ctr., Inc., 329 F.Supp.2d 1046, 1051 (D.N.D 2004). "Plainly absent from this [ADEA] language is any protection for persons who simply champion the cause of an older worker, even if the advocate acts out of an unarticulated belief that the employer is discriminating on the basis of age. Thus, liability will not attach unless the activity in question advances beyond advocacy and into recognizable opposition to an employment practice that the claimant reasonably believes to be unlawful." Garcia-Paz v. Swift Textiles, Inc., 873 F.Supp. 547, 559 (D.Kan. 1995). See, Trammel v. Simmons First Bank of Searcy, 345 F.3d 611, 615 (8th Cir. 2003) (informal letters charging improper loan procedures not covered by ADEA because protest not premised on age discrimination); Howell v. N. Central Coll., 331 F.Supp.2d 660, 664 (N.D.Ill. 2004) (plaintiff must oppose unlawful conduct under the statute); Schulz v. Varian Med. Sys., Inc., 315 F.Supp.2d 923, 937-938 (N.D. Ill. 2004) (in order to be protected under the ADEA retaliation provision the formal charges or informal grievance must

mention age discrimination). *See also*, <u>Dolence v. U.S. Nat'l Bank</u>, 797 F.Supp. 423, 426 n.6 (W.D. Pa. 1992) (testimony that opposition to "discharges [was] not because of [plaintiff's] concern for the employees' ages, but because he thought they presaged a purge of 'old-timers,' regardless of their ages" immaterial to an ADEA retaliation cause of action).

### (a) McDonnell Douglas Standard

When only circumstantial evidence of discriminatory retaliation is available the *McDonnell Douglas* burden-shifting analysis is also utilized. Hence, "plaintiff must make a prima facie showing of retaliation by presenting evidence that (1) he engaged in protected conduct, (2) he was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and the adverse action." <u>Che v. Mass. Bay Transp. Auth.</u>, 342 F.3d 31, 38 (1st Cir. 2003). *See also*, <u>Calero-Cerezo v. U.S. Dept. of Justice</u>, 355 F.3d 6, 26 (1st Cir. 2004); <u>Benoit v. Technical Mfg. Corp.</u>, 331 F.3d 166, 175 (1st Cir. 2003); <u>Gu v. Boston Police Dept.</u>, 312 F.3d at 6; <u>Soileau v. Guilford of Maine, Inc.</u>, 105 F.3d 12, 16 (1st Cir. 1997); <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 827 (1st Cir. 1991); <u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1179 (1st Cir. 1991). "Once the plaintiff has made a prima facie showing of retaliation, the *McDonnell Douglas* burden-shifting approach is employed, and defendant must articulate a legitimate, non-retaliatory reason for its employment decision. If the defendant meets this burden, the

plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Calero-Cerezo, 355 F.3d at 26; Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); Che, 342 F.3d at 39. Should the employer advance a legitimate reason for its decision, "the ultimate burden falls on the plaintiff to show that the employer's proffered reason is pretext masking retaliation...." Mesnick, 950 F.2d at 827.

However, in the context of a summary judgment "'the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus.'" Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d at 26 (citing Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)).

### (b) Discussion

Because an ADEA retaliation claim is an independent cause of action plaintiff's failure to prevail on his own age discrimination suit does not preclude a retaliation cause of action under ADEA. Hence, plaintiff "may assert such a [retaliation] claim even if the underlying claim of [discrimination] fails." Soileau v. Guilford of Maine, Inc., 105 F.3d at 16. See also, Wright v. CompUSA, Inc., 352 F.3d at 477 (plaintiff need not succeed on a discrimination claim to

CIVIL NO. 03-1446 (RLA)                                              **Page 34**

properly assert retaliation);    Vincenty Martell v. Estado Libre
Asociado de Puerto Rico, 48 F.Supp.2d 81, 89 (D.P.R. 1999) ("It is of
no consequence to his retaliation claims that plaintiff has failed to
present a claim of discrimination under ADEA.")

> The fact that a plaintiff eventually proves unable to
> establish that the employer violated the ADEA in the first
> instance is not fatal to his prima facie case of
> retaliation.   It is enough that the plaintiff had a
> reasonable, good-faith belief that a violation occurred;
> that he acted on it; that the employer knew of the
> plaintiff's conduct; and that the employer lashed out in
> consequence of it.

Mesnick, 950 F.2d at 827.

In this case plaintiff has put at issue defendant's proffered
reasons for his termination while at the same time presenting
specific instances of his rejection to practices contrary to the ADEA
and the age discrimination work environment it generated which have
gone unchallenged.

When the record is reviewed in the light most favorable to
plaintiff we find the evidence of retaliation sufficient to survive
defendant's summary judgment. There is ample evidence in the record
for a reasonable juror to find that plaintiff's dismissal was in
retaliation for voicing his opposition to the open discriminatory
treatment given to employees protected by the ADEA.

Accordingly, the motion to dismiss plaintiff's retaliation claim is **DENIED**.

### LAW 100

Law 100 is the local equivalent of ADEA providing for civil liability, *inter alios*, for age discrimination in employment.[46] De La Vega v. San Juan Star, Inc., 377 F.3d at 119; Alvarez-Fonseca v. Pepsi Cola de Puerto Rico Bottling Co., 152 F.3d 17, 27 (1st Cir. 1998); Varela Teron v. Banco Santander de Puerto Rico, 257 F.Supp.2d 454, 462 (D.P.R. 2003). The statute initially requires that plaintiff present evidence that the action complained of - in this case dismissal - was taken without just cause[47] "which entails proving three elements: (1) that he or she was [not hired]; (2) that the [failure to hire] was without just cause; and (3) some basic fact substantiating the type of discrimination alleged." Varela Teron, 257 F.Supp.2d at 463 (footnote omitted). *See also,* De La Vega, 377 F.3d at 119 (citing Baralt v. Nationwide Mut. Ins. Co., 251 F.3d 10, 16 (1st Cir. 2001)) ("'Under Law 100, a plaintiff establishes a prima

---

[46]  In pertinent part, the statute provides:

> Any employer who... fails or refuses to hire or rehire a person... on the basis of... age... shall incur civil liability....

29 P.R. Laws Ann. § 146.

[47]  The Puerto Rico Supreme Court has determined that the term "just cause" in Law 100 will be construed in accordance with its definition in Law 80 an analogous statute applicable to unjust terminations of employment. Baez Garcia v. Cooper Labs., Inc., 120 D.P.R. 145, 155 (1987). *See also*, Alvarez-Fonseca, 152 F.3d at 28.

CIVIL NO. 03-1446 (RLA)                                           **Page 36**

facie case of age discrimination by (1) demonstrating that [she] was... discharged, and (2) alleging that the decision was discriminatory.'"); <u>Rodriguez-Torres v. Caribbean Forms Mfr., Inc.</u>, 399 F.3d 52, 62 (1st Cir. 2005) (sanctioning jury instructions which required plaintiff "to *prove* that she was in a protected class, that she was fired *and* that the termination was *unjustified*." (italics in original)).

As previously noted, evidence regarding plaintiff's own age discrimination is lacking. "Therefore, for the same reason that [his] ADEA claim fails, [his] Law 100 claim also fails." <u>De La Vega v. San Juan Star, Inc.</u>, 377 F.3d at 119. *See also*, <u>Gonzalez v. El Dia, Inc.</u>, 304 F.3d at 73 n.7 ("The district court order dismissing the Law 100 claim must be affirmed as well, since the merits of the age-discrimination claims asserted under the ADEA and Law 100... are coterminous.")

### CONSTITUTIONAL POLICY EXCEPTION[48]

The Puerto Rico Supreme Court has established an exception to the exclusive remedy provided in Law 80 for termination of employment predicated on grounds which impinge on an employee's constitutional rights. In <u>Arroyo v. Rattan Specialties, Inc.</u>, 117 D.P.R. 35 (1986) the Puerto Rico Supreme Court ruled that requiring an employee to

---

[48] Contrary to defendant's notion, plaintiff is not seeking relief under Law 80 but rather has stated an independent cause of action for damages resulting from the alleged unconstitutional conduct surrounding his termination.

CIVIL NO. 03-1446 (RLA)                                                    **Page 37**

submit to a polygraph test under the particular conditions of employment present threat violated the employee's constitutional right to privacy, personal integrity and dignity which entitled him to seek both equitable and monetary relief from his employer.

> The fact that the violation of the constitutional rights in this case took place within the context of a labor-management relationship, and the fact that the worker has been retained under an employment-at-will contract, does not mean that he waived his constitutional rights and was barred from obtaining a real and effective remedy to vindicate them... [T]his legislation [Law 80] cannot operate to deprive the worker of the adequate remedies for effectively vindicating his constitutional rights. In the case at bar the employer's conduct violated the fundamental constitutional rights of the employee. We are dealing here with a wrongful dismissal that subverts a constitutional-ranking public policy. In view of the circumstances, plaintiff was entitled to file a petition for injunction and seek the damages caused to him.

Arroyo, 117 P.R. Offic. Trans. at 75. *See also*, Segarra Hernandez v. Royal Bank de Puerto Rico, 145 D.P.R. 178 (1998) (even though claim did not rise to constitutional level court reiterated exception to Law 80's exclusive remedy in cases where employer infringed employee's constitutional rights).

CIVIL NO. 03-1446 (RLA)                                           **Page 38**

The constitutional policy exception was also upheld in <u>Negron v. Caleb Brett U.S.A., Inc.</u>, 212 F.3d 666, 670 (1st Cir. 2000) where the court found that plaintiff's "constitutional rights to privacy and dignity could be implicated if she were pressured to make illegal alterations to lab reports that would jeopardize her licence or subject her to civil and criminal liability." The court explained that "[f]orcing an employee to choose between [his] employment and [his] profession, its code of ethics, and the law, is certainly a matter of personal integrity, and thus... [plaintiff's] claim is within the constitutional policy exception to Law 80 created by Arroyo." <u>Negron</u>, 212 F.3d at 670.

In this case plaintiff claims that his dismissal was prompted by his alleged opposition to certain LEO BURNETT-PR practices which he considered illegal and/or improper. These were: the creation of a division called Interactiva purportedly to overbill clients; retaining monies due clients in suspense accounts for an indefinite length of time, and hiring aliens without the necessary work permits.

As CFO plaintiff was ultimately responsible for the adequacy of the accounting practices at LEO BURNETT and the correctness of the financial information supplied to the clients. Thus, if - as plaintiff contends - he was required to provide altered and false information to corporate clients his constitutional right to personal and professional integrity would be at stake. The same would hold true for knowingly processing payments to individuals working at LEO

CIVIL NO. 03-1446 (RLA)                                                     **Page 39**

BURNETT without the required visa permits by way of issuing checks for cash advances which were made payable normally to BENAVENT and at times to plaintiff who, in turn, turned the funds over to the aliens.

Defendant counters that the suspense accounts problem was due to poor accounting practices of plaintiff's predecessor and that in his deposition plaintiff stated that he did not know whether or not he could be held liable for this practice. Additionally, defendant rejects plaintiff's arguments and counters that plaintiff was not responsible for recruiting foreigners and that he did not complain about this practice. In support of their argument that plaintiff never voiced his complaint defendant points to the fact that it was not until five months after his discharge that plaintiff for the first time made his opposition to the aforementioned accounting and business practices known via a letter sent to  the officers of LEO BURNETT's world-wide operations.

However, at this juncture we are not here to decide whether plaintiff's allegations are true but whether he has presented sufficient evidence for a jury to find that he "had been asked to do something improper or illegal." Negron, 212 F.3d at 671.

Accordingly, defendant's request to dismiss the claims asserted under the constitutional policy exception to Law 80 is **DENIED.**

                                **CONCLUSION**

CIVIL NO. 03-1446 (RLA)                                         Page 40

Based on the foregoing, defendant's Motion for Summary Judgment (docket No. **76**)[49] is disposed of as follows:

Dismissal of plaintiff's ADEA claim is **GRANTED.**

Dismissal of plaintiff's ADEA retaliation claim is **DENIED.**

Dismissal of plaintiff's Law 100 claim is **GRANTED.**

Dismissal of plaintiff's constitutional policy exception to Law 80 is **DENIED.**

Judgment shall be entered accordingly.

Plaintiff's Motion in Limine (docket No. **86**)[50] and Motion in Limine Regarding Defendant's Exhibits (docket No. **100**) are **DENIED.**

IT IS SO ORDERED.

San Juan, Puerto Rico, this 8th day of July, 2005.


                                    S/Raymond L. Acosta
                                   RAYMOND L. ACOSTA
                                   United States District Judge


_____

[49] *See also*, Statement of Material Facts (docket No. **77**); Motion submitting Certified Translations (docket No. **83**); Plaintiff's Opposition (docket No. **88**); Exhibits (docket No. **90**); Reply to Plaintiff's Opposition (docket No. **97**); Response to Defendant's Reply (docket No. **101**), and Plaintiff's Amended Statement of Contested Facts (docket No. **104**).

[50] *See also*, Opposition (docket No. **92**) and Reply (docket No. **93**).